**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **MI FAMILIA VOTA; MARLA LÓPEZ; MARLON LÓPEZ; and PAUL RUTLEDGE** | |
| **Plaintiffs,** | **Case No. 5:21-cv-00920** |
| **vs.** | |
| **GREG ABBOTT, in his official capacity as Governor of Texas; JOSE ESPARZA, in his official capacity as Texas Deputy Secretary of State; WARREN "Ken" PAXTON, in his official capacity as Attorney General of Texas,** | |
| **Defendants.** | |

---

**PLAINTIFFS' COMPLAINT**

---

**INTRODUCTION**

1.     Texas's new voter suppression law, 2021 Texas Senate Bill No. 1, 87th Legislature ("SB 1"), is a calculated effort to disenfranchise voters. If allowed to stand, the bill will unconstitutionally burden qualified voters and inevitably prevent many voters from lawfully casting their ballots in future elections. The undue burdens imposed by SB 1 will be greatest for Black and Latino voters, just as the Texas Legislature intended. SB 1 is riddled with purposefully confusing and deceptive rules, unfair processes, cumbersome and potentially expensive verifications, and traps that can only be interpreted as intentional, unfair, and unnecessary obstacles to the fundamental right to vote.

2.      SB 1 places additional heavy burdens on voters in Texas, a state that consistently limited voter access to the polls. In the last decade alone, Texas closed hundreds of polling locations, nearly doubling the number of voters who use each polling site. Texas has maintained excuse-only mail-in voting even during the COVID-19 pandemic and stringent voter identification laws. While voters across the state already face closed polling locations, extended travel time to polling sites, and wait times that exceed four hours, SB 1 prohibits counties from making voting accessible and safe for lawfully registered voters.

3.      The burdens of SB 1—like other Texas laws that limit access to the polls—singly and together fall disproportionately on Black and Latino voters. For example, H.B. 1888, 86th Legislature, Reg. Sess. (Tex. 2019) amending Tex. Elec. Code ELEC §85.064, prohibited counties from establishing mobile early voting locations, which targeted and burdened counties with growing Black and Latino voting populations. SB 1 will burden those same voters who were historically and repeatedly disenfranchised in the state. From all-white primaries to poll taxes, from literacy tests to annual re-registration requirements, Texas has repeatedly adopted one law after another, for the purpose and with the effect of making it harder for voters of color to vote.  SB 1 is yet another attempt to continue that tradition of discrimination.

4.      The Texas Legislature engineered SB 1 to cancel or discourage the activities used successfully by Black and Latino voters. The law prohibits counties from using drive-through voting, expanding voting hours, and automatically mailing eligible voters mail-in ballot applications. At the same time, the law creates rigid new requirements for mail-in ballots by requiring voters to provide the same identification number on their ballot as on their registration, allowing ballot signatures to be compared against signatures more than six years old, and allowing two different committees to analyze each ballot and reject allegedly defective ballots without notice to the voter of the alleged defect. SB 1

also requires a monthly purging of voter rolls, coupled with rigid requirements that burden eligible voters who are wrongly purged.

5.      The law also burdens and limits people who provide necessary physical and language assistance to voters, which in turn will unduly burden voters who cannot vote without such assistance. SB 1 impedes assistance like transportation to the polls, navigation within a polling place, translation of a ballot printed in a language unfamiliar to the voter, or physical help to complete a ballot. These provisions burden registered voters who need help to vote and who are most likely to be Black and Latino.

6.      Finally, the law provides enormous (and disproportionate) protections and power to poll watchers at the expense of voters who face the threat of unencumbered intimidation while exercising their Constitutional right to vote. This in the face of Texas' sad history of armed militias and extreme partisans intimidating voters of color.

7.      The Texas Legislature's action followed the record turnout for the November 2020 election—more total voters than Texas recorded in nearly 30 years. In particular, Latino and Black citizens voted in higher numbers than ever before.

8.      Despite record turnout in 2020 and the Secretary of State's own analysis that the 2020 election was safe and secure, the Texas Legislature enacted SB 1 without adequate facts or reasonable basis to support the need to change the law. The problem that SB 1 purportedly set out to fix, voter fraud, simply does not exist.

9.      The provisions in SB 1 challenged by Plaintiffs do nothing to immunize Texas voting against fraud.  Instead, they impede access to Texas voting by prohibiting the voting activities that produced record turnout, particularly among Latino and Black voters, in 2020. The Texas Legislature's intent to discriminate against voters of color is clear.

10.     SB 1 unlawfully discriminates against voters of color, in violation of the First, Fourteenth, and Fifteen Amendments to the Constitution and Section 2 of the Voting Rights Act of 1965. The additional burdens on those who assist voters unlawfully deprive voters of their right to an assistant of their choice, in violation of Section 208 of the Voting Rights Act of 1965.

11.     Plaintiffs bring this action to (1) obtain a judgment declaring that the challenged provisions of SB 1 are illegal and unenforceable, and (2) prevent Defendants from implementing and enforcing those provisions of SB 1.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, and Sections 2 and 208 of the Voting Rights Act of 1965, 52 U.S.C. §§ 10301 and 10508.

13.     This Court has jurisdiction under Article III, § 2 of the U.S. Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1357.

14.     This Court has authority to enter declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15.     Venue is proper in this district under 28 U.S.C. § 1391 because the Defendants engage in their official duties in this District, and all of the Defendants reside in Texas.

## PARTIES

### I.    PLAINTIFFS

16.     Plaintiff Mi Familia Vota is a national, non-profit civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice. Through increasing awareness and education, Mi Familia Vota encourages voter registration and participation,

and challenges voter suppression around the nation. Mi Familia Vota operates in six states, including Texas.

17.     In preparation for the election in Texas in 2020, Mi Familia Vota helped Black, Latino, and Asian-American Pacific Islander ("AAPI") voters throughout Texas develop plans to vote. The organization educated these voters about changes made in Harris County, including 24-hour voting and drive-through voting; educated voters about who was eligible to vote by mail, and who was not; and provided training to voters and to poll workers regarding the lawful activities of poll watchers, and how to de-escalate any confrontation that could be intimidating to voters. For example, during the 2020 general election, Mi Familia Vota responded to 1,200 calls for assistance with voter registration.

18.     With the adoption of SB 1, Mi Familia Vota must divert personnel, time, and resources away from its routine community activities to respond to SB 1. Specifically, Mi Familia Vota must now spend money, time, and other resources to (1) increase voter awareness, education, and support to comply with the expansive new rules of SB 1; (2) increase voter awareness and education about new voting restrictions that may result in rejected mail-in ballot applications or rejected ballots completed by lawfully registered voters; (3) increase awareness and education about the elimination of voting methods used in 2020 that will no longer be available to voters, including 24-hour voting and drive-through voting; (4) increase awareness and education about new restrictions on people who provide transportation and other physical and language assistance at the polls to ensure that the elderly, disabled, or non-English-speaking voters who Mi Familia Vota supports are able to vote in compliance with SB 1; (5) increase awareness and education about the new requirements to apply for mail-in ballots so that these voters will not wait for election officials to send them an application; and (6) increase awareness and education of voters and poll workers about the expanded rights of poll watchers and the potential for intimidation of voters and poll workers under the new law. Mi Familia Vota will also have to expend

resources to help lawfully registered voters monitor voter rolls to ensure that voters are not incorrectly purged from the voter rolls and assist with the costly and complicated system of reestablishing lawful registration status. Under SB 1, Mi Familia Vota resources are also required to support voters who, under burdensome time constraints, must cure mail-in ballots for alleged deficiencies -- if election officials choose to provide notice.

19.     Mi Familia Vota will have to spend finite resources on these activities so long as the challenged provisions of SB 1 are in effect. Given the dramatic changes in SB 1 that directly affect the voting methods used by Black, Latino, and AAPI voters in 2020, the demand on Mi Familia Vota's finite resources is significant, and Mi Familia Vota will be forced to choose among or eliminate some of the services it provides to Texas voters.

20.     In addition to the impacts on the Mi Familia Vota organization, SB 1 will negatively affect the people who Mi Familia Vota serves, many of whom are Black, Latino, and AAPI.

21.     Plaintiff Marla López, who is Latina, is a registered Texas voter residing in Harris County, Texas, who intends to vote in the next election. Ms. López voted early in the November 2020 election at a drive-through location in Harris County. Ms. López voted in the evening. Voting early, in the evening on a Saturday, and at a drive-through location was the only time and manner that allowed both her and her father to vote. Ms. López experienced voter intimidation in past elections, and the prospect of increased voter intimidation by the poll watchers allowed by SB1 makes her more hesitant to vote in the future. Ms. López will be impacted by the new provisions in SB 1.

22.     Plaintiff Marlon López is a registered Texas voter residing in Harris County, Texas, who intends to vote in the next election. Mr. López works long hours and travels for work. In 2020, he was able to vote with his daughter via drive-through voting, taking advantage of the extended voting hours that were offered to voters during the early voting period. Due to his long work hours, this was the only

time and manner that allowed him to vote. In previous elections, Mr. López's work schedule and travel conflicted with limited voting hours, and long lines kept him from voting. Mr. López will be impacted by regulations in SB 1.

23.     Plaintiff Paul Rutledge is a registered Texas voter and a resident of Montgomery County, Texas, who intends to vote in the next election. Mr. Rutledge works in Harris County, Texas, as a billing/inventory clerk. He commutes one hour each way. He is diabetic and asthmatic, and lives with his elderly mother. In person voting in 2020 during the COVID-19 pandemic jeopardized Mr. Rutledge's safety because the polling location lacked enforcement of social distancing or mask wearing, and people were crowded together. Voting hours often conflicted with Mr. Rutledge's work hours and his long commute, keeping him from voting in the past. For these reasons, he votes during early voting periods and on the weekend.

24.     SB 1 will reduce early voting hours and eliminate safe alternative voting options for Mr. Rutledge, increasing his burden to exercise his right to vote.

**II.     <u>DEFENDANTS</u>**

25.     Defendant Greg Abbott is the Governor of Texas and is sued in his official capacity.

26.     Defendant Jose A. Esparza is the Deputy Texas Secretary of State and is sued in his official capacity. Defendant Esparza is the acting Secretary of State because that office is currently vacant. The Office of the Secretary of State, which Defendant Esparza now leads, is charged with enforcing the new statutory provisions that place an undue burden on voters of color.

27.     Defendant Warren "Ken" Paxton is the Attorney General of Texas. Along with the office of the Secretary of State, the Attorney General is charged with enforcing the new statutory provisions that place undue burdens on voters of color and that govern the activities of poll watchers.

## GENERAL ALLEGATIONS

I.    **TEXAS HAS A LONG HISTORY OF DISCRIMINATING AGAINST AND BURDENING VOTERS OF COLOR**

28.    SB 1 exacerbates the burdens on Texas voters across the state. These burdens are greatest for Black and Latino voters.

29.    Unfortunately, Black, and Latino voters in Texas have long faced unconstitutional efforts to block their access to the polls. Texas history is replete with both explicit and subtle intentional efforts to suppress or restrict voting of eligible Texas residents who are members of racial and language minority groups, like those that Mi Familia Vota serves. These tactics were rampant against Latinos and Blacks as far back as Texas statehood in 1845 and persist into the 21st century.

30.    White primaries, poll taxes, prohibitions on Spanish language political materials and political rallies, racial restrictions on serving as election judges, and gerrymandering of voting districts were all features of Texas's voting landscape into the mid-20th Century. Election officials and legislators in Texas continued to use voter registration purges, gerrymandering, and malapportionment to suppress Black and Latino voters into the 1970s.[1]

31.    Even after imposition of the pre-clearance requirements of Section 5 of the federal Voting Rights Act in 1982, Texas passed multiple laws that unlawfully burdened Black and Latino voters.[2] Between 1982 and 2013, more challenges to discriminatory voting procedures under Section 2

---

[1] Robert Brischetto et al., *Texas*, in QUIET REVOLUTION IN THE SOUTH:  THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990 (Chandler Davidson & Bernard Grofman eds., 1994).
[2] Nina Perales et al., *Voting Rights in Texas: 1982-2006*, 17 UNIV. S. CAL. REV. L. & SOC. JUST. 713, 728-43 (2008) (describing in detail the basis for various objections and denials from voting procedures to election methods, to redistricting and annexations). The U.S. Department of Justice objected or denied preclearance to voting changes in Texas under Sections 3 and 5 of the Voting Rights Act more than 107 times, 23 of which occurred between 1995 and 2013. *See* Nat'l Comm'n on Voting Rights, State Profiles: Texas at 8-10(hereinafter "NCVR Report"), Voting Landscape: State-by-State Profiles (votingrightstoday.org) (last visited Sept. 16, 2021).

of the Voting Rights Act were decided or settled in favor of minority plaintiffs in Texas than in any other state.[3]

32.     Incidents of voter intimidation by police officers and election officials, abrupt closure, or relocation of early voting locations in precincts of predominantly voters of color immediately before an election,[4] and understaffing of polling locations in predominantly non-white precincts further evidence relentless efforts to disenfranchise voters of color in Texas.[5]

33.     As recently as 2016, Texas was required to rewrite its voter identification law because it was found to unlawfully burden voters of color, in violation of the Voting Rights Act.[6]

34.     In recent years Texas has closed as many as 50% of all polling places in counties across the state. As a result, between 2012 and 2018, almost 750 polling places in Texas were closed. Of the 750 polling places that closed between 2012 and 2018, 542 were in counties that recorded the most Black and Latino residents.[7] Closures resulted in a near doubling of the average number of eligible voters served by each polling place.[8] With the majority of closures affecting Black and Latino

---

[3] Between 1995 and 2014, 75 Section 2 cases were decided or settled in favor of minority voter plaintiffs. *See* NCVR Report at 2-6.

[4] United States Comm'n on Civil Rights, Texas Advisory Comm., VOTING RIGHTS IN TEXAS, AN ADVISORY MEMORANDUM at 9-11 (July 2018) (describing voter intimidation, discriminatory impact of polling place relocations, and adverse impact of closing polling locations on voters of color during 2016 election); *accord* Perales, *supra* note 2 at 741-43.

[5] Perales, *supra* note 2, at 748 (citing Election Protection Comm'n, SHATTERING THE MYTH: AN INITIAL SNAPSHOT OF VOTER DISENFRANCHISEMENT IN THE 2004 ELECTIONS (2004)).

[6] *Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016).

[7] *See* Richard Salame, *Texas closes hundreds of polling sites, making it harder for minorities to vote*, The Guardian (Mar. 2, 2020), https://www.theguardian.com/us-news/2020/mar/02/texas-polling-sites-closures-voting.

[8] Texas had one polling place per 4,000 voters in 2012 as compared with one per 7,700 voters in 2018. *See* Univ. of Texas at Austin, Notley Scholars Voting Rights Project, an Exploration of Voting Rights in Travis County, *Modern Day Voter Suppression* (utexas.edu) (last visited Sept. 16, 2021).

neighborhoods,[9] compared to white voters, voters of color in Texas must travel much longer distances and endure significantly longer wait times to vote.

35.     Polling place closure, particularly in majority Black or Latino counties, continued past 2018, resulting in fewer polling places even as the state's population increases—and even as voters demonstrated an increasing interest in voting.

36.     Latino voters also are subject to distinct forms of discrimination and voter suppression. Texas jurisdictions have repeatedly failed to make Spanish language voting materials available to Latino voters, flouting compliance with Section 203 of the Voting Rights Act. More than 10 cases brought under Section 203 of the Voting Rights Act in Texas have been resolved in favor of Latino voter plaintiffs since 2000.[10]

37.     Further, after turnout among Latino voters reached historic levels in 2018, Texas officials raised spurious claims that nearly 100,000 voters were not citizens and voted unlawfully, only to admit subsequently that the voters were all naturalized U.S. citizens.[11]

38.     Before SB 1, voting in Texas was harder than in other states. According to a "cost of voting index" study by political scientists at Northern Illinois University and Jacksonville University, it

---

[9] *See id.*; *see also* Benjamin Wermund, *Texas Has Closed More Polling Places Than Any Other State, Report Shows*, Houston Chronicle (Sept. 10, 2019), https://www.houstonchronicle.com/politics/texas/article/Texas-has-closed-more-polling-places-than-any-14429443.php.
[10] *See* NCVR Report at 7.
[11] *See* Texas Secretary of State, Election Advisory No. 2019-02; Settlement Agreement, *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB  (W.D. Tex., case filed Jan. 20, 2019), https://campaignlegal.org/sites/default/files/2019-04/Agrmt%20all%20signatures.pdf; *see also*, National Public Radio, *Texas Officials Begin Walking Back Allegations About Noncitizen Voters* (Jan. 30, 2019), https://www.cpr.org/2019/01/30/texas-officials-begin-walking-back-allegations-about-noncitizen-voters/.

is harder to vote in Texas than in any other state. At the time of the study, prior to the 2020 election, Texas also had one of the lowest voter turnout rates.[12]

39.     In 2020, voter turnout rates surpassed recent records due in large part to counties that took proactive steps to make voting safe and accessible to all voters. In response to the 2020 record participation and voter access success, the Texas Legislature again enacted barriers making it harder to vote. The SB 1 prohibitions sweepingly cancel the very measures that successfully served voters of color in recent elections.

40.     SB 1 boldly builds on and extends Texas's long legacy of impeding, burdening, and discriminating against voters of color.

## II.      SB 1 IS MOTIVATED BY A DISCRIMINATORY PURPOSE

41.     On information and belief, SB 1 was enacted with the purpose of denying or abridging the right of Black and Latino Texans to vote on account of race or color.

42.     During floor debates, legislators made clear that concerns about "fraud" were mere pretext, and that concerns about a voter's race was paramount in legislators' minds. During the Texas House debate on the legislation, when Democratic House members raised concern about the impacts of the bill on voters of color, Republican House Speaker Dade Phelan specifically cautioned members not to use the word "racism" while debating the legislation.

43.     On information and belief, Texas Legislators knew that the provisions of SB 1 challenged by this action impose a disproportionate burden, both singly and together, on Black and Latino voters, and knew that SB 1 diminishes the opportunities for Black and Latino voters to participate in the

---

[12] *See* Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state*, TEX. TRIBUNE, Oct. 19, 2020, https://www.texastribune.org/2020/10/19/texas-voting-elections/.

political process in an equal manner with white voters.  Against the history of voting discrimination in Texas, the demographic shifts in the Texas voting population, the record-breaking increases in voter turnout among Black and Latino voters in the 2020 election, and the lack of any evidence of wide-spread fraud, the voter suppression motivation is clear.

### III.    SB 1 RESTRICTS VOTING RIGHTS AND DISPROPORTIONATELY BURDENS VOTERS OF COLOR

44.    SB 1 contains new tricks and catches that impede voters' access to the polls, that create new hurdles for voters who are lawfully registered to vote, that create new hurdles for voters who lawfully cast their mail-in ballots, and that expose voters and election officials to intimidation. The burdens fall most heavily on voters of color and on voters who require physical or language assistance to vote, the same voters who participated in record turn-out in 2020, who safely and successfully used the voting options canceled by SB 1, and who are the most susceptible to suppression and intimidation. These changes impact Plaintiffs.

### A.    Purge Provisions Based on Citizenship Burden Lawfully Registered Voters and Place an Undue Burden on Latino Voters

45.    Section 2.05, of SB 1 amends Tex. Elec. Code § 16.0332 and mandates both monthly and quarterly purges of the voter rolls by the Texas Secretary of State's office, ostensibly to identify noncitizens. Voters removed during a monthly purge must provide additional proof of citizenship to retain their voter registration.

46.    Voters subject to purge include those excused from jury duty based on lack of citizenship and any person who indicated a lack of citizenship on their Department of Motor Vehicle form. Such purges burden voters of color who are naturalized and lawfully registered, requiring them to provide costly proof of citizenship, like passport or birth certificate, documentation that naturalized voters may

not possess. Providing the required proof of citizenship is costly and time-consuming.  If proof of citizenship is not received on or before the 30th day after the county registrar issues a notice, a voter's registration is canceled.[13]

47.     Purges targeting Latino voters are not new. After Latino voters turned out to vote in record numbers during the 2018 election, Texas officials conducted a flawed review of the state's voter rolls and wrongly claimed that nearly 100,000 voters were not citizens. Subsequent investigation confirmed that the identified voters were all naturalized U.S. citizens.[14]

48.     Under the new law, however, the onus is on the voter to provide additional proof of citizenship—proof not required by anyone else registered to vote in the state.

### B.     Prohibitions on Voting Options Impose a Disproportionate and Undue Burden on Voters of Color

49.     Under SB 1, counties cannot expand curbside voting options, offer drive-through voting, or otherwise offer voting in ways that support voters within their communities. SB 1, § 3.04 (amending Tex. Elec. Code § 43.031(b)), § 3.12 (amending Tex. Elec. Code § 85.061(a)), and § 3.13 (amending Tex. Elec. Code § 85.062). And voting must occur between the hours of 6 a.m. and 10 p.m. Counties will no longer be able to offer extended hours or 24-hour voting. SB 1, § 3.09 (amending Tex. Elec. Code § 85.005); *id.*, § 3.10 (amending Tex. Elec. Code § 85.006(b)).

50.     Expanded early voting, drive-through voting, and 24-hour voting facilitated record voter participation in 2020, particularly for urban voters of color. Fewer options for voting will increase the

---

[13] Texas Election Code Section 16.0332 addresses cancellation of registration due to citizenship status.
[14] *See* Texas Secretary of State, Election Advisory No. 2019-02, *supra* note 10; Settlement Agreement, *Tex. League of United Latin Am. Citizens*, *supra* note 10; *see also*, National Public Radio, *supra* note 10.

already substantial burdens of distance, time, and safety on voters who already confront a high number of voters per polling location.

51.     For example, in prior elections wait times exceeded two hours. During the March 2020 primary, voters remained in line hours after the polls were closed. At Texas Southern University in Houston, voters were casting ballots almost six hours after polls closed.[15] Black and Latino voters were most likely to have to wait in long lines to vote.[16]

52.     Prohibitions on voting options in SB 1 directly target specific measures Harris County implemented in the 2020 general election. In 2020, the measures in Harris County, one of the most diverse population areas in Texas, increased access for all voters, particularly Black, Latino, and other voters of color, during the global pandemic.

53.     For the 2020 general election, Harris County instituted longer voting hours and one day of 24-hour voting in eight locations.[17] Harris County and Bee County also implemented drive-through voting. These changes reduced wait times and increased voter access, particularly for voters who historically have been disproportionately affected by long voting lines.[18] Over 140,000 Harris County

---

[15] Alexa Ura, *Texas voting lines last hours after polls close on Super Tuesday*, TEX. TRIBUNE, Mar. 3, 2020, https://www.texastribune.org/2020/03/03/texas-voting-lines-extend-hours-past-polls-closing-super-tuesday/.

[16] *See* Connor Perrett, *Young black and Latino voters spent hours waiting to vote in Texas and the state can't even say how it will fix the problem before November*, INSIDER, Mar. 4, 2020, https://www.businessinsider.com/texas-voting-lines-super-tuesday-worse-in-november-2020-3. National studies also show that long wait times at the polls are correlated with precincts with a higher percentage of voters of color. Jonathan Coopersmith, *It Takes a Long Time to Vote*, TEXAS A&M TODAY, July 9, 2020, https://today.tamu.edu/2020/07/09/it-takes-a-long-time-to-vote/.

[17] Abigail Rosenthal, Harris County early voting hours extended to 10 p.m. until Thursday, CHRON, Oct. 27, 2020, https://www.chron.com/news/election2020/article/Harris-County-early-voting-hours-extended-to-10-15677986.php.

[18] "The new alternatives, tailored to a diverse work force struggling amid a pandemic in Texas' largest county, helped increase turnout by nearly 10 percent compared with 2016; nearly 70 percent of registered voters cast ballots." Nick Corasaniti, *Republicans Target Voter Access in*

- 14 -

voters took advantage of early voting, including 10,000 individuals who voted in a single night of 24-hour voting.[19] Overall, early in-person voting in the 2020 general election increased 9% over early voting in the 2016 general election. In the two largest counties, Harris and Dallas, the increase was over 11%.[20]

54.     An analysis by the Texas Civil Rights project shows that 53% of the voters who used the Harris County drive-through option and 56% of the voters who voted during extended voting hours were Black, Hispanic, or Asian.[21]

55.     With the stroke of a pen, SB 1 cancels these measures, burdening Harris County voters and countless others throughout Texas. The experience in 2020 in Harris County demonstrated the benefits of voting options to expand access and stimulate voter engagement. And the record turnout was achieved without any evidence that these measures resulted in voter fraud or that these measures created opportunity for fraud. Late-night and drive-through voters, for example, were subject to the same requirements as voters during the day, and each polling location was staffed by election officials and poll workers who received the same training as officials and workers who staffed the polling places during daytime hours.[22]  Canceling these successful measures does not immunize the Texas voting system from fraud, it only impedes and burdens voters, particularly Latino and Black ones.

---

*Texas Cities, but Not Rural Areas*, N.Y. TIMES, updated May 30, 2021, https://www.nytimes.com/2021/04/24/us/politics/texas-republicans-voting.html?action=click&module=RelatedLinks&pgtype=Article.
[19] *Id.*
[20] *See* Texas Secretary of State, Election Information & Turnout Data, 2020 Nov. 3rd General Election, https://earlyvoting.texas-election.com/Elections/getElectionDetails.do; *id.*, Early Voting – Nov. 4, 2016, https://www.sos.texas.gov/elections/earlyvoting/2016/nov4.shtml.
[21] Texas Civil Rights Project (@TXCivilRights), Twitter (Mar 27, 2021, 10:56 a.m.), https://twitter.com/txcivilrights/status/1375869409919700997?s=21.
[22] *See* Harris County Elections, Drive Thru Voting, https://harrisvotes.com/drivethruvoting (last visited Sept. 16, 2021) (drive-through voting uses the same voting machines and procedures as

C.      **Curtailed Access to Mail-In Ballots and Disqualification of Mail-In Ballots Increase the Burdens on Voters**

56.     SB 1 places new burdens on voters who wish to vote by mail under Texas's limited, excuse-only mail-in voting system.

57.     SB 1 prohibits election officials from sending or facilitating the sending of mail-in applications to eligible voters. Election officials risk felony charges and the possibility of criminal charges for allegedly soliciting mail-in ballot applications. *See* SB 1, Section 5.04 (adding Tex. Elec. Code § 84.0111); *id.*, Section 7.04 (adding Tex. Elec. Code § 276.016). This will severely curtail voters' ability to obtain information from election officials about mail-in voting options, increasing burdens on voters who already face a lengthy process to apply for and obtain a mail-in ballot.

58.     Onerous identification requirements in SB 1 for mail-in ballots impede voting by mail and enable disqualification of more ballots. Under SB 1, requests for mail-in ballots must include the voter's driver's license number, election identification certification, Department of Public Safety personal identification card, or social security number; and these numbers must match the number provided on the voter's initial voter registration. Mismatched numbers—even if they are from two different identification cards—are grounds to reject the application. SB 1, Section 5.02 (amending Tex. Elec. Code § 84.002); *id.*, Section 5.03 (amending § 84.011(a), and effective September 1, 2021); *id.*, Section 5.07 (amending Tex. Elec. Code § 86.001).

59.     Voters must provide the same identification information on the ballot itself. A mismatch at this stage results in rejection of the ballot. And the vote is not counted. SB 1, Section 5.08 (amending Tex. Elec. Code § 86.002). Voters who do not understand this catch or who cannot recall which

---

walk-in voting; video on the website shows individual staff member going up to a voter's car to check identification, hand the voter a voting device).

identification number they relied on initially will have their application or ballot tossed aside, canceling their vote.

60.     Voters who elect to drop off their mail-in ballots rather than mailing them face an extra step, too. These voters must provide their name, signature, and matching identification at drop off, all of which is recorded by the election official. SB 1, Section 4.12 (amending Tex. Elec. Code § 86.006).

61.     SB 1 authorizes two groups to review mail-in ballots—the early voting ballot board and the signature verification committee.  These groups are separate, but they look for the same defects. This overkill approach to mail-in ballot review is not justified by any evidence of fraud occurring with the existing, and already limited, mail-in ballot system.

62.     Among other defects, the two groups compare ballot envelope signatures with any known signature on file for discrepancies, no matter how long ago the voter supplied that first signature. Reviewers are not required to have training in handwriting examination, which is an inaccurate science. This aspect of SB 1 will particularly burden people who by reason of age or disability change their signature over time.

63.     SB 1 also creates arbitrary mechanisms for providing notice to voters of such defects and gives both the signature verification committee and early ballot committees authority to reject ballots without providing any notice to voters. If either group finds an alleged defect, they determine if there is time to return the ballot by mail and for the voter to return the corrected ballot prior to the election. SB 1, Section 5.12 (adding Tex. Elec. Code § 87.0271); *id.*, Section 5.14 (adding Tex. Elec. Code § 87.0411). If there is not enough time to complete this sluggish mail-based process, then they may, but are *not required to*, give notice by telephone or email.  In this random scheme and on the whim of the reviewer, some voters may receive notice of a defect, others may not.

64.     SB 1 impedes early mail-in voting and burdens voters who utilize this method. The mail-in ballot application identification requirements contort the mail-in voting process and increase the likelihood that a minor or inadvertent discrepancy will disqualify an application or a ballot. The new identification, review groups, random notice practices, and drop off chore create a tricky and complicated process for voters. Plaintiff Mi Familia Vota will be forced to divert resources to assist voters with these changes and will spend significant time educating voters on these new rules and on trying to support voters who may or may not receive notice of alleged defects.

### D.     Poll Watchers Can Subject Voters of Color to Harassment and Intimidation, Impeding the Fundamental Right to Vote

65.     Texas's history of voter intimidation is well documented. In Harris County, for example, groups of white volunteers traveled to polling places in Black and Latino neighborhoods to interfere with voting, demanded that voters of color identify themselves, told voters of color they will go to prison for voting if they have ever gone to jail, and donned law enforcement-style clothing for an intimidating effect.[23]

66.     SB 1, Section 4.01 (amending Tex. Elec. Code § 32.075) and Section 4.07 (amending Tex. Elec. Code § 33.056) will increase voter and election official intimidation from poll watchers, curtailing the ability of election officials to protect voters and volunteers and ensure secrecy of voters' ballots. Poll watchers, under SB 1, have nearly unlimited authority to move freely about polling places and counting locations, and to be in proximity of voters.

---

[23] U.S. Comm'n on Civ. Rights, *An Assessment of Minority Voting Rights Access in the United States*, 2018 Statutory Report at 77 (Sept. 12, 2018) (citing *Veasey v. Perry*, 71 F. Supp. 3d 627, 636-37 (S.D. Tex. 2014)); Judy Bao, *Voter Intimidation in Texas During the 2020 General Election*, Texas Civil Rights Project (Feb. 2021), https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.

67.     Election officials are not able to remove poll watchers except under limited circumstances that are personally witnessed by the election official. Even where poll watchers are accused of violating the penal code, only the presiding judge may request that law enforcement remove the offending poll watchers. Protecting the voting precinct from disruption will depend on police response and discretion.

68.     Under SB 1, Section 6.01 (amending Tex. Elec. Code § 64.009) poll watchers can also watch persons assisting voters, including those who provide transportation or language assistance, and consequently intimidate the assistants and the voters who need assistance. These enhanced provisions place an undue burden on voters of color, who will lose valuable and necessary assistance if their assistants are deterred or reluctant to provide aid.

69.     Increased authority for poll watchers poses serious threats to ballot secrecy and allows for intimidation of voters and their assistants waiting in line or voting, inside and outside polling places.

**E.     Voter Assistance Is Severely Impaired, Placing an Undue Burden on Voters**

70.     SB 1 significantly increases the burden on people who assist voters, which in turn burdens voters who need assistance to exercise their right to vote.

71.     Anyone who transports more than seven (7) voters to the polls must complete a form, providing personal information, and identifying the authority to provide assistance. SB 1, Section 6.01 (amending Tex. Elec. Code § 64.009).

72.     Anyone who assists a voter with a ballot (in person or mail-in) must complete a form providing name and address; relationship to the voter; and whether they have accepted compensation or benefit from a candidate, campaign, or political committee, and sign an oath. SB 1, Section 6.03 (amending Tex. Elec. Code § 64.0322).

- 19 -

73.     Anyone who assists with filling out a mail-in ballot must provide the same information on the official carrier envelope as required for providing in-person assistance as in SB 1, Section 6.03 (above). SB 1, Section 6.05 (amending Tex. Elec. Code § 86.010). Assistants who are not related to or live with the voter must sign an oath that other assistants are not required to sign.

74.     If an assistant declines to complete these burdensome tasks, then the voter will be deprived of the voter's chosen assistant, both violating Section 208 of the Voting Rights Act and posing an undue burden on those most likely to need assistance, including those with English-language deficiencies and persons with disabilities.

## F.     Voting for Employees Who Need Time off to Vote Is Jeopardized

75.     Employers need not grant time off to employees to vote, if any early voting location is open for two (2) hours before or after an employee's work hours, SB 1, Section 7.03 (amending Tex. Elec. Code § 276.004), jeopardizing the likelihood that some workers will vote.

76.     Under this employer-focused provision of SB 1 workers confront compounding circumstances created by the law, such as fewer voting locations forcing more travel and longer wait times, no mobile or temporary voting sites that added convenience to voting, and the inability to access drive-thru voting locations in groups. SB 1 ignores the realities many workers face of public transportation, carpooling, long commutes, multiple jobs, school, childcare, or eldercare, and jeopardizes the rights of working voters to vote.

## G.     Authority to Respond to Emergencies Is Curtailed, Disproportionately Affecting and Burdening Voters of Color.

77.     Section 7.04 (amending Tex. Elec. Code § 276.017) of SB 1 prohibits county election officials from creating, altering, modifying, waiving, or suspending any election standard in the code.

There is no exemption for natural disasters, public health crises, other emergencies, or needs of the community.

78.     During the COVID-19 pandemic, counties scrambled to create safe, effective methods of voting while protecting communities struggling with COVID-19. Counties must move quickly to support voters during crises or natural disasters. SB 1 strips this authority from counties, which in turn will unconstitutionally burden the right of voters to vote during emergencies.

IV.     **CLAIMS OF VOTER FRAUD IN THE 2020 ELECTION ARE UNSUPPORTED BY THE FACTS AND CONTRADICTED BY COMMENTS OF THE TEXAS SECRETARY OF STATE**

79.     Governor Abbott and the supporters of SB 1 claim that actions in the 2020 general election compromised the integrity of Texas elections.[24] In a press conference on the integrity of the 2020 election, Governor Abbott specifically criticized actions taken in Harris County to ensure access to safe voting during the COVID-19 pandemic, including expanded hours, drive-through voting, and 24-hour voting.[25] Governor Abbott and the legislators supporting SB 1 presented no evidence of widespread

---

[24] Press Release, Office of the Texas Governor, Governor Abbott Holds Press Conference On Election Integrity Legislation (Mar. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-holds-press-conference-on-election-integrity-legislation; Taylor Goldenstein, *Fact checking Texas lawmaker's claim of 400 voter fraud 'cases'*, HOUSTON CHRONICLE, Apr. 12, 2021, https://www.houstonchronicle.com/politics/texas/article/Fact-checking-Texas-lawmaker-s-claim-of-400-16095858.php.
[25] Press Release, *supra* note 24.

voter fraud in Texas or in any county, nor provided any evidence that the activities outlawed by SB 1 increased opportunities to commit fraud.

80.     As of April 2021, with over 11.3 million total ballots cast in the state in the November 2020 election, only 0.000379%[26] (or just 43) of those ballots were allegedly implicated in voter fraud charges in Texas.[27]

81.     The claims of 2020 voter fraud are further undermined by contemporaneous statements from former Texas Secretary of State Ruth R. Hughs, who issued a press release commending Texas voters on the historic voter turnout and praising election officials on conducting a "free and fair election."[28] The Secretary of State's 2020 Texas Election Security Update further provides: "There is no evidence that any voting or voter registration systems in Texas were compromised before the 2016 Election or in any subsequent elections."[29] And in comments opening the 87th Texas Legislature on January 12, 2021, former Secretary Hughs stated that the 2020 election was "smooth and secure."[30]

---

[26] Nonprofit Vote and U.S. Elections Project, America Goes to the Polls 2020 at 31 (updated Mar. 18, 2021), https://www.nonprofitvote.org/wp-content/uploads/2021/03/america-goes-polls-2020-7.pdf.
[27] Goldenstein, *supra* note 24.
[28] News Release, Texas Secretary of State, Secretary Hughs Commends Texas Voters Following November 3rd General Election (Nov. 30, 2020),
https://www.sos.state.tx.us/about/newsreleases/2020/113020.shtml.
[29] Texas Secretary of State, 2020 Texas Election Security Update,
https://www.sos.state.tx.us/elections/conducting/security-update.shtml (last visited Sept. 16, 2021).
[30] Taylor Goldenstein and Jeremy Blackman, Did a 'smooth and secure' 2020 election cost the Texas secretary of state her job?, HOUSTON CHRONICLE, May 21, 2021,
https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php.  Democrats in opposition to SB 7, the initial iteration of Texas's voter suppression bill, focused on those statements, which may have cost Secretary Hughs her job; she resigned after the GOP failed to confirm her appointment by Governor Abbott in May 2021.

82.     The Election Security Task Force for Harris County—home to a 43.7% Latino and 20% Black population[31]—found no evidence of fraud there, stating "[d]espite claims, our thorough investigations found no proof any election tampering, ballot harvesting, voter suppression, intimidation or any other type of foul play that might have impacted the legitimate cast or count of a ballot."[32]

83.     The 2020 election was a historic sea change for voting in Texas, particularly among underrepresented Black and Latino populations. Despite taking place in the midst of the COVID-19 pandemic, nearly 60.4% of the eligible voting population turned out in Texas; over 11 million Texans exercised their right to vote.[33] The historic 2020 turnout represented a 9% increase over the 2016 numbers—the eighth highest voter turnout growth rate in the nation.[34] Latino, Asian, and Black voter

---

[31] United States Census Bureau, QuickFacts Harris County, Texas, https://www.census.gov/quickfacts/fact/table/harriscountytexas/POP010220#POP010220 (last visited Sept. 16, 2021).

[32] Constable Alan Rosen et al., Final Productivity Report, Harris County Election Security Task Force at 8 (Dec. 17, 2020), https://www.dropbox.com/s/7mzy6aws7fnzvy9/Elections%20Security%20Task%20Force%20final%20report%20PUBLC%20FINAL%2012-17-20%20442p.pdf?dl=0. Such glowing praise of Texas' 2020 election system is consistent with the findings of the Secretary of State after the 2018 election, where it was reported that "Our Office believes the elections system in the State of Texas to be extremely resilient, due in no small part to the hard work and dedication of local election officials in maintaining proper security protocols," and "Our Office is confident that Texas voters can trust the election systems" Report to the Texas Legislature on Election Cybersecurity Preparedness (Nov. 30, 2018), https://www.sos.state.tx.us/elections/forms/1-hb-8-report-public-summary.pdf.

[33] United States Election Project, 2020 November General Election Turnout Rates (last updated Dec. 7, 2020), http//www.electproject.org/2020g; https://www.nonprofitvote.org/resource/https-nonprfvote-wpengine-com-wp-content-uploads-2021-03-america-goes-polls-2020-7-pdf/.

[34] America Goes to the Polls 2020, *supra* note 26.

turnout all increased from 2016 to 2020.[35] Latino voter turnout increased by more than 10 percent compared to 2016 numbers.[36]

84.     None of the activities outlawed by SB 1 were linked to fraud or risk of fraud in the Texas voting system. SB 1 simply attacks and cancels the activities that supported the historic voter engagement in Texas in 2020 without any evidence that one or all of the activities exposed the Texas voting system to fraud.

85.     The Texas Legislature need not wait for prevalent election fraud before drafting prophylactic laws; however, the virtual absence of voter fraud in 2020 lays bare the pretextual nature of the Texas Legislature's true intentions.  SB 1 continues Texas' history of disenfranchising Black and Latino voters. The provisions challenged by this action are unlawful and implementation of SB 1 should be stopped.

## CLAIMS FOR RELIEF

### COUNT ONE
### Undue Burden on the Right to Vote in Violation of
### the First Amendment and the Due Process Clause of the Fourteenth Amendment

86.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs' allegations.

---

[35] United States Census Bureau, Voting and Registration in the Election of November 2020, Table 4b, Reported Voting and Registration by Sex, Race and Hispanic Origin, for States (Apr. 2021), https://www.census.gov/topics/public-sector/voting/data/tables.html; *id.*, Voting and Registration in the Election of November 2016, Table 4b, Reported Voting and Registration by Sex, Race and Hispanic Origin, for States (May 2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.
[36] Voting and Registration in the Election of November 2016, Table 4b, *supra* note 39; Voting and Registration in the Election of November 2020, Table 4b, s*upra* note 39.

87.     The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides

that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

U.S. Const. amend. XIV, § 1.

88.     The First Amendment of the U.S. Constitution, which is applicable to the States through

the Fourteenth Amendment prohibits "abridging the freedom of speech." The First Amendment protects

the right of Texans to vote for the candidate of their choosing.

89.     The "political franchise of voting" has long been held to be a "fundamental political

right, because [it is] preservative of all rights." *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 667 (1966)

(citation omitted). When considering the constitutionality of a limitation on the right to vote, a court

must consider the burden of that limitation in light of "the precise interests put forward by the State as

justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

90.     "However slight th[e] burden may appear, . . . it must be justified by relevant and

legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty.*

*Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (internal quotation marks and

citation omitted). Where the restrictions are severe, the regulation "must be narrowly drawn to advance a

state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992).

91.     Importantly, "laws that govern the political process surrounding elections—and, in

particular, election-related speech and association—go beyond merely the intersection between voting

rights and election administration, veering instead into the area where 'the First Amendment has its

fullest and most urgent application.'" *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722

(M.D. Tenn. 2019) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

92.     The arsenal of suppressive measures in SB 1 will severely burden Texas voters who attempt to exercise their right to vote lawfully. The tricks, catches, and new requirements of SB 1 will burden Mi Familia Vota in providing services that increase awareness and educate voters. In pursuit of its organizational purpose, Mi Familia Vote will be burdened by the SB 1 limitations, singly and collectively, that impede engagement in election-related speech and that curtail the ability to associate freely while engaging in the political process.

93.     For example, SB 1 outlaws the ability of non-partisan groups to distribute mail-in ballot materials, directly burdening the voter registration and outreach activities of Plaintiff, Mi Familia Vota. As a non-partisan advocacy organization, Mi Familia Vota assisted voters with obtaining mail-in ballots in past elections. Through this work Mi Familia Vota communicates its beliefs in the power and importance of participating in democratic elections. Such activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988).

94.     SB 1 inhibits Mi Familia Vota's speech by "limit[ing] the number of voices who will convey [Mi Familia Vota's] message," and "the size of the audience they can reach." *Id.* at 422–23.

95.     The First Amendment "include[s] the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)).

96.     The Legislature's pretextual justifications of fraud pale in comparison to Plaintiff's right to associate and engage in the political process. *Cf. Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir.

1997) (rejecting the argument that regulating an election "process" raises no First Amendment concerns).

97.     SB 1 also violates the First Amendment rights of Mi Familia Vota and individual voters, including Plaintiffs Marla López, Marlon López, and Paul Rutledge (collectively "individual voter Plaintiffs") by restricting those with whom a voter can associate on their way to and at the polls without providing personal information, disproportionately impacting voters of color, who live further away from polling locations than their white counterparts, are less likely to have access to transportation, are more likely to carpool, and are more likely to rely on others outside of their home and nuclear family for assistance in voting—e.g., friend, pastor, fellow parishioner, or neighbor with close ties to the voter, but who is not an actual blood relation.

98.     SB 1 compels the speech of assistants by forcing sworn oaths to qualify. Voters of color—in particular, non-native English speakers—are more likely to rely on voting assistance revealing the discriminatory intent of these new requirements.

99.     A law that "compel[s] individuals to speak a particular message" by following a "government-drafted script" that "alte[rs] the content of [their] speech" is a "content-based regulation of speech" and, therefore, "presumptively unconstitutional." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (internal quotation marks and citations omitted). Such laws are subject to strict scrutiny. *See id*.

100.    Another First Amendment violation is the power afforded poll watchers. Under SB 1 roving bands of "concerned citizen" poll watchers are authorized to monitor and listen to the conversations of voters and those with whom they associate. The potential for poll watchers to surveil those that do not look or sound like them with closer scrutiny is obvious. Fearful voters of color, like those served by Mi Familia Vota, will stay away from sacred polling places to avoid intimidation. SB 1

directly impacts the "overlapping" rights "of individuals to associate for the advancement of political beliefs" and "of qualified voters . . . to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

101.    Even if reducing voter fraud were the true motivation for SB 1, and it is not, that interest is slight here. There is no evidence that SB 1 will cure a real risk of voter fraud, or that the activities utilized in 2020 contributed to fraud within the Texas system. The Texas Secretary of State has confirmed the integrity of Texas's elections, as has every court asked to address challenges to the 2020 election.

102.    Texas's interest in the restrictions enacted by SB 1 is neither narrowly tailored nor sufficiently compelling to justify the severe burdens imposed on the rights of Mi Familia Vota or the individual voter Plaintiffs. The restrictions imposed by this law are arbitrary, lack rational justification, and violate the First Amendment.

103.    Mi Familia Vota will be required to divert finite resources from their typical activities to educate Black and Latino voters about the new and onerous requirements of SB 1. Unless an injunction to stay the effect of SB 1 issues, this Plaintiff will suffer irreparable injuries for which there is no adequate remedy at law.

104.    Defendants, acting under color of state law, have deprived and, absent an injunction,  will continue to deprive Plaintiffs their rights secured by the First and Fourteenth Amendments to the U.S. Constitution and protected by 42 U.S.C. § 1983.

**COUNT TWO**
**Racial Discrimination and Denial of Equal Protection Under the Law**
**in Violation of the Fourteenth and Fifteenth Amendments**

105.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

106.    The Fourteenth Amendment provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

107.    Section 1 of the Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

108.    Discriminatory intent may be established by proof that Defendants used race as a motivating factor in their decisions. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

109.    SB 1 violates the Fourteenth and Fifteenth Amendments because it was adopted for the purpose of denying non-Anglo voters—including Latino, Black, and other voters of color—full and equal access to the political process. As discussed above, SB 1 specifically and impermissibly targets voting methods that Latino, Black, and other voters of color used in record numbers in the most recent election, with the goal of suppressing these voters.

110.    In addition, Texas's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 1, the sequence of events which resulted in their enactment, and the tenuousness of their justifications raise a strong inference of discriminatory purpose in violation of the Fourteenth Amendment.

111.    Unless an injunction to stay the effect of SB 1 issues, Plaintiffs Marla López and Marlon López will be subject to an unjustifiable burden on their right to vote, and Plaintiff Mi Familia Vota will

be forced to continue expending additional resources to protect Texan Latino and Black voters' right to vote. Plaintiffs will each suffer irreparable injuries for which there is no adequate remedy at law.

112.    Defendants, acting under color of state law, have deprived and, absent an injunction,  will continue to deprive Plaintiffs their rights secured by the Fourteenth and Fifteenth Amendments to the U.S. Constitution and protected by 42 U.S.C. § 1983.

**COUNT THREE**
**Racial Discrimination in Violation of the Voting Rights Act**

113.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

114.    Section 2 of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

115.    The challenged provisions of SB 1 violate Section 2 of the Voting Rights Act because they deny or abridge the right to vote and were adopted for the purpose of denying voters of color—including Latino, Black and other voters of color—full and equal access to the political process on account of their race or color.

116.    The challenged provisions of SB 1 further violate Section 2 of the Voting Rights Act because they are intended to disproportionately abridge or deny voters of color an equal opportunity to participate in the political process and elect representatives of their choice by denying their right to vote. The challenged provisions of SB 1 specifically target voting methods that Latino, Black, and other voters of color used in record numbers in the most recent election. SB 1 was enacted in the context of a

long history of Texas lawmaking that prevented voters of color from having equal opportunity to participate in the political process on account of their race, ethnicity, or color.

117.    The challenged provisions of SB 1 abridge or entirely deny the rights of voters of color who make up Mi Familia Vota's core constituency.  Mi Familia Vota will have to divert finite resources from their typical activities to increase awareness and educate voters about the new law.

118.    Voting for each of Marla López and Marlon López is unjustifiably burdened by SB 1.

119.    Defendants, acting under color of state law have deprived Plaintiffs of their rights secured by Section 2 of the Voting Rights Act and protected by 42 U.S.C. § 1983.  Absent an injunction, Defendants will continue to deprive Plaintiffs of these rights.  Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

**COUNT FOUR**
**Violation of Section 208 of the Voting Rights Act – Voter's Right to Assistance**

120.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

121.    Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" in English for any reason "may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

122.    Section 208 establishes the right of a voter with a disability or a voter with limited English proficiency or limited literacy to an assistant of the voter's choosing to assist the voter with the voting process, including physically navigating the polling place, interacting with poll workers, reading, and interpreting the ballot, and marking the ballot. Although Texas election law provides voters who need assistance with the right to receive such assistance from a person of their choice as required by

- 31 -

Section 208, SB 1's new restrictions render that provision meaningless by impeding the voter's practical ability to get assistance. SB 1 thus violates Section 208 of the Voting Rights Act. Texas knows that well. *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (holding that Texas law limiting who can provide assistance to non-English speaking voters violated Section 208 of the Voting Rights Act).

123.    If an injunction does not issue to stay the effect of SB 1, the individual Plaintiffs will be subject to an unjustifiable burden on their right to vote, and Plaintiff Mi Familia Vota will be forced to spend additional resources to protect Latino and Black voters' right to vote. Defendants, acting under color of state law, have deprived Plaintiffs of their rights secured by Section 2 of the Voting Rights Act and protected by 42 U.S.C. § 1983.  Absent an injunction, Plaintiffs will each suffer irreparable injuries for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

a.    Declare that SB 1 violates the First, Fourteenth, and Fifteenth Amendments of the United States Constitution and Sections 2 and 208 of the Voting Rights Act;

b.    Preliminarily and permanently enjoin Defendants, along with their respective agents, officers, employees, and successors, from enforcing the challenged provisions of SB 1 set forth above;

c.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable law;

d.    Retain jurisdiction to ensure ongoing compliance with the foregoing orders; and

e.    Grant such other and further relief that this Court deems just and proper.

DATED:  September 27, 2021

Respectfully submitted,

LYONS & LYONS, P.C.
237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
Telefax: (210) 225-6545

By:  */s/Sean Lyons*
Sean Lyons
State Bar No. 00792280
Sean@lyonsandlyons.com
Clem Lyons
State Bar No. 12742000
Clem@lyonsandlyons.com

Wendy J. Olson (*Pro hac vice* forthcoming)
Laura E. Rosenbaum (*Pro hac vice* forthcoming)
Marc Rasich (*Pro hac vice* forthcoming)
Elijah Watkins (*Pro hac vice* forthcoming)
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (208) 387-4291
wendy.olson@stoel.com
laura.rosenbaum@stoel.com
marc.rasich@stoel.com
elijah.watkins@stoel.com

Courtney Hostetler (*Pro hac vice* forthcoming)
John Bonifaz (*Pro hac vice* forthcoming)
Ben Clements (*Pro hac vice* forthcoming)
Ron Fein (*Pro hac vice* forthcoming)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org